ETHEL M. PHAIR, Appellant, *v.* L. FIGUEIREDO S. A. et al., Respondents.

First Department, February 15, 1955.

*Milton P. Kupfer* of counsel (*Eli S. Silberfeld, Theodore M. Newman* and *Jordan H. Eskin* with him on the brief; *Kupfer, Silberfeld, Nathan & Danziger,* attorneys), for appellant.

*Thomas W. Kelly* of counsel (*Thornton C. Land* and *Frank E. Nattier, Jr.,* with him on the brief; *Breed, Abbott & Morgan,* attorneys), for respondents.

CALLAHAN, J. On a trial before the court and a jury, the complaint in this case was dismissed at the close of the whole testimony. The question on appeal is simply whether plaintiff established a prima facie case requiring submission to the jury.

Four causes of action were set forth in the complaint, two

against each defendant. The first and the second were based upon an alleged sale of flour to these defendants. Plaintiff now concedes that no such cause of action was established.

The third and fourth causes of action were based upon a claim that on May 2, 1949, in Brazil, the Brazilian defendant requested the plaintiff's assignors to release and deliver certain shipping documents representing 72,187 sacks of flour to said defendant or upon its order, and in consideration of such release said defendant promised and agreed to pay or cause to be paid to the plaintiff's assignors (the owners of the flour) in New York $451,150.07, representing that it had received and was holding sufficient funds to make said payment. The complaint further alleges that plaintiff's assignors released the documents as requested by the defendant. It states that no part of the sum of $451,150.07 has been paid, except $193,000, leaving an unpaid balance of $258,150.07.

The evidence would permit a finding that late in April, 1949, a quantity of 72,187 one-hundred-pound sacks of milled flour owned by the plaintiff's assignors had arrived by steamer S.S. *Evgenia* in Santos, Brazil. An intended sale to others having fallen through, plaintiff's assignors sent a flour broker, one Ueland, to Santos, to dispose of the flour. He was met there by one Berson, the manager of the defendant L. Figueiredo S. A., a Brazilian corporation (hereinafter referred to as the Brazilian defendant). After several days of discussions, in which Ueland made clear that the offer was for sale of the documents in exchange for dollar payments in New York, Berson told Ueland, according to the latter's testimony, that he had " received payment for  *  *  *  the flour " and wanted to " buy " it; that he would " buy " the flour — " take possession of the documents;" — " he would pay us in New York dollars, $50,000 to be paid the next day and $200,000  *  *  *  within ten days and the total amount to be paid within a maximum of thirty days."

Berson, on the other hand, testified, in substance, that on May 2d he told Ueland that a group of Brazilian merchants headed by one Mofarrej had made an offer to buy this flour, and, when Ueland expressed concern over securing payment of dollars in New York, Berson suggested that it might be arranged to have sufficient Brazilian cruzeiros deposited in Brazil by the Mofarrej group with some neutral firm in Brazil to insure the payment of the dollars, and the Brazilian defendant agreed at the request of Ueland and Mofarrej to act as the depository. At Berson's suggestion, an excess of 25% of cruzeiros was to be obtained to cover fluctuations in the foreign exchange. There-

upon, Berson obtained checks from Mofarrej for 13,138,000 cruzeiros. Some of these checks were certified; others could not be certified. Ueland indicated a willingness to close immediately. Berson also said that Ueland desired $50,000 to be paid immediately in New York, and, after consultation with Mofarrej, Berson reported that this would be satisfactory. He added that Mofarrej had authorized him to request the New York defendant " to start paying right away and that within a very short time * * * they [Mofarrej and associates] would refund the L. Figueiredo (U. S. A.) Corporation for the amounts which until then " the New York corporation would have paid on account of the deal. Thereupon several letters were written and exchanged between the parties to evidence the transaction. In addition, indorsements were made on the numerous shipping documents, and they were delivered by Ueland to Berson.

It must be conceded that, standing alone, the letter addressed by the Brazilian defendant to Ueland and one written by Ueland to Mofarrej indicate that Mofarrej was the buyer, and the Brazilian defendant was merely the depository of the security. The indorsements on the shipping documents and some statements made by Ueland in communication to his principal had like import. On the other hand, on May 3, 1949, the Brazilian defendant cabled to the New York defendant, and a copy of this cable was delivered by Berson to Ueland at the time the other documents were exchanged. This cable could well be construed to evidence a direct agreement by the defendants that they would be obligated to pay the dollars in New York. It said to its subsidiary that " We are undertaking that you will pay " certain sums within ten days and the balance within thirty days, and to pay immediately $50,000 on account, and, requested the subsidiary to advise the New York attorney for the sellers that the New York corporation would pay the total within thirty days. The following day the New York defendant wrote a letter to the sellers' attorney, which again evidenced a direct obligation on defendant's part to pay the dollars on specified dates. In fact, the $50,000 was paid by the New York defendant quite promptly, and it does not appear that Mofarrej furnished these dollars. Later, and before the delivery of the flour was stopped, $193,000 was paid in New York. It was testified that these dollars were paid by defendants. Proof to show the source of these payments was excluded by the trial court.

Defendants seek to justify the dismissal of the complaint on the ground that the contract was formulated in writing by certain of the letters and documents referred to, and that the cable and

confirmatory letter are merely historical so that contradictions between the letter and the formal contractual documents did not create any ambiguity. As noted, however, a copy of this cable was handed to Ueland at the same time as the other documents were exchanged. The follow-up letter by the New York defendant to the seller's lawyer clearly had the purpose of showing how payment was to be expected. At least, the jury could find that these documents were delivered as part of and to formalize the transaction. If there was an ambiguity or direct contradiction in the documents as to the role being played by defendants in the matter — and we find that there is — the question of the obligation assumed by defendants was for the jury.

In support of plaintiff's contentions that the release of the shipping documents was in exchange for a promise by defendants to pay the dollars in New York, we have the circumstances that the sellers did not even concern themselves with the identity of those in Mofarrej's group, and no document pledging payment was obtained from Mofarrej or anyone in his group.

Defendants contend, on the other hand, that they were not shown to have any interest in the transaction other than as brokers or fiscal agents. They were concerned, however, with receiving some $43,000, which they had advanced to meet the expense of shipment. They admitted that the Brazilian defendant was to receive a commission from Mofarrej and his group upon the sale, and there was testimony that Berson had said that the Brazilian defendant would make a profit on the transaction. In any event, these collateral matters were circumstances to be considered by the jury.

As to the reasons for the nondelivery of the flour, it appears that after Mofarrej had obtained a little more than half of these goods, the Brazilian Government confiscated the rest, claiming that the consular invoices for exportation of the flour from New York to Brazil were forged. The flour was seized and declared contraband, and sold at auction. Mofarrej apparently was the buyer at the auction sale. Whether the loss resulting from such seizure should fall on plaintiff or defendants presents a second issue raised by a defense pleaded in the answer. It, too, presents questions for the jury.

The judgment appealed from should be reversed and a new trial ordered, with costs to the appellant to abide the event.

Peck, P. J. (dissenting). I dissent and vote to affirm. It is clear upon the evidence, in my view, that defendants were not the purchasers of the flour, as originally claimed by plaintiff and

testified by her principal witness, or the equivalent thereof as underwriters of the sale and of payment by the purchaser. Plaintiff now concedes that her claim that defendants were the purchasers is not supported by the evidence and that claim has been abandoned. To my mind the like claim that defendants were the guarantors of payment by the purchaser is equally untenable.

The documents are somewhat confusing. But the sense and substance of the arrangement between the parties sufficiently emerges. Defendants undertook to receive from the purchaser security for its performance and to hold the security until the purchaser had made payment. Defendants also undertook as a matter of mechanics, required by foreign exchange incidents of the transaction, to act as paying agents of the purchaser. Defendants acted only in a collateral capacity and not as principals.

Undoubtedly payment would have been made by the purchaser through defendants except for the happening of the unexpected — intervention by the Brazilian Government, seizing the flour as contraband, and preventing consummation of the sale. The rights and obligations of purchaser and seller in this situation are undetermined and not involved in the present case. Indeed plaintiff seeks to avoid litigation and adjudication of this issue, by asserting an absolute liability of defendants regardless of the position taken by the buyer that it is not liable because of failure of consideration.

I think that plaintiff's claim is against the buyer and perhaps against the Brazilian defendant on another theory to recover the security deposit. There is no primary liability on the part of defendants such as plaintiff asserts in this case.

BREITEL and BASTOW, JJ., concur with CALLAHAN, J.; PECK, P. J., dissents and votes to affirm in opinion, in which BOTEIN, J., concurs.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event. Settle order.